AUGUST J. HAUPTLI, JR., AND BARBARA HAUPTLI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hauptli v. Commissioner
Docket No. 8254-87
United States Tax Court
T.C. Memo 1988-518; 1988 Tax Ct. Memo LEXIS 545; 56 T.C.M. (CCH) 583; T.C.M. (RIA) 88518; November 7, 1988
Petitioners purchased compressed gas cylinders for lease to a welding business. In order to determine whether the term of the lease is less than 50 percent of the useful life of the property for purposes of section 46(e) (3), we look to the applicable class life in the Asset Depreciation Range System. Held: Class life 57.0 applicable to Distributive Trades and Services applies to the lessee welding business, which is the business activity to be considered pursuant to section 1.167(a)-11(e) (3) (iii), Income Tax Regs.
Thomas J. Kennedy, for the petitioners. Osmun R. Latrobe, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined a deficiency in the Federal income tax liability of petitioners for the calendar year 1983 in the amount of $ 13,668. The issue for decision is whether petitioners are entitled to investment credit under section 46(e) (3) (B) [1] for the purchase during 1983 of 1,000 compressed gas cylinders for lease to a unrelated party. More specifically the issue is whether the term of the lease is less than one-half of the useful life of the property. *547 FINDINGS OF FACT Some of the facts have been stipulated and they are so found. At the time of the filing of the petition, petitioners, who are husband and wife, were residents of Salina, Kansas. Petitioners' 1983 Federal income tax return was filed on a cash receipts and disbursement basis. Brown Welding Supply, Inc., is a Kansas corporation and at least at the time of trial was a subsidiary of Brown Industries. It or its parent has for many years been engaged in the gas supply business. Gas cylinders of the type involved in this business are used as the container for the storage under pressure of various gases used in various industries and in medical offices and hospitals. Typical of these gases are oxygen, acetylene, argon, nitrogen, carbon dioxide, and helium and various mixtures thereof. Brown Welding or its parent (collectively referred to as Brown Welding) were, during 1983 and for a number of years prior thereto, engaged both in the sale and distribution of these gases and in the wholesale rental of gas cylinders to other suppliers of gases. Typically, the gas supplier or distributor sells the gas in the cylinder to a customer and rents the cylinder to the customer *548 as a container for the gas until empty. The cylinder is then supposed to be returned to the supplier. Gas cylinders are composed of the cylinder itself, a collar, a cap, and a valve. The collar and cap are needed in order to protect the valve from damage during shipping and handling of the cylinder. The cylinders are almost indestructible having a useful life of more than 35 years. The collar and cap are subject to breakage and the valve may be broken or become worn out. However, these items may be replaced for a relatively small cost. The collar serves the dual function of holding the cap in place and identifying the owner of the cylinder or the lessee, either of which may be the gas distributor or gas supplier. This has significance in part because of the custom or law which prohibits any gas supplier or distributor from filling a gas cylinder which does not have that particular person's name on the cylinder collar. It is advantageous to the supplier of gas to the end user to have that supplier's name engraved on the collar in that there is then an incentive on the part of the consumer of the gas to return the cylinder to that particular supplier for refilling. Most of these *549 gases are manufactured and supplied by a small number of manufacturers, one of which is Union Carbide Corporation or one of its subsidiaries (collectively Union Carbide). During this period of time, it was the practice of Union Carbide to cause its name to be placed on collars of gas cylinders which is leased to gas suppliers to whom it wholesaled various gases. This practice prevented the retail supplier of gas from exercising maximum control over the gas cylinders so obtained. It permitted the ultimate user to return the cylinder to any retail supplier who purchased gas from Union Carbide. Union Carbide leased the cylinders to gas suppliers on a daily rental basis, permitting the supplier to return excess cylinders at any time. A similar rental arrangement of the cylinders normally existed between the supplier of gas and the consumer. Brown Welding conceived of the idea of purchasing gas cylinders from the cylinder manufacturers and renting those cylinders to other gas suppliers. One of the inducements offered was the placing of the name of the lessee-gas supplier on the collar. Because Brown Welding saw a larger market for the rental of gas cylinders to other gas suppliers *550 than could be met by the number of cylinders which its financial structure permitted it to purchase for its own account, it set up a program by which individuals such as Mr. Hauptli could purchase gas cylinders from manufacturers and enter into agreements with Brown Welding for management of the leasing of the cylinders. During 1982 and 1983 Brown Welding entered into several arrangements with investors including petitioners pursuant to which 5,000 of these cylinders were leased to A & R Welding Supply Corp. (A & R) for use by A & R in its gas distribution business. Through Brown Welding Mr. Hauptli purchased from Chesterfield Cylinder Co., Inc. (Chesterfield) 1,000 of these cylinders for lease to A & R. During 1983 A & R had thousands of cylinders under lease from Union Carbide. A & R was able to return to Union Carbide a number of cylinders equivalent to the number rented through Brown Welding. Approximately 48 percent of A & R's revenue was derived from sale of gases, approximately 17 percent from cylinder rental, and the remaining 4 percent from delivery charges and other revenue. In order to induce A & R to enter into cylinder rental agreements, Brown Welding fixed the *551 rental at an amount equal to 70 percent of the then current rental being paid to Union Carbide. The other advantages of this rental arrangement were that the cylinders were all new and thus would not require testing for a minimum of 10 years, their valves were better than the Union Carbide valves, A & R's name was placed on the collar, and the leases had purchased options. The reduced rental rate reflected in part the fact that the cylinders were leased for a fixed term of 5 years as contrasted with the daily rental rate charged by Union Carbide. The lease term between Mr. Hauptli and A & R, as originally proposed by Brown Welding, was 7 years, with a specified monthly rental, subject to an annual cost-of-living adjustment commencing on January 1, 1985. After the initial term the lease continued from year to year until terminated by not less than 12-months prior written notice. A & R as lessee had the right to purchase any or all of the cylinders at specified prices. The only material changed from the first proposal by Brown Welding was reduction of the initial term to 5 years and a small reduction in the specified option purchase price. These changes were made in part to *552 conform the Hauptli rental arrangement to the rental agreements already executed covering the other 4,000 cylinders leased to A & R by other investors. On October 21, 1983, the date of the agreement between Mr. Hauptli and A & R, there was no understanding or agreement between the parties to the lease as to whether the lease would be allowed to continue in effect or would be terminated at the end of the 5-year initial term. Neither was there any understanding or agreement as to whether the cylinders would be purchased pursuant to the purchase option. It was A & R's intent at that time to maintain maximum flexibility which would allow it to terminate the lease at the end of its 5-year term, to purchase the cylinders during the period of the term or to allow the lease to continue in effect after the expiration of the term unless terminated by Mr. Hauptli. Of course, Mr. Hauptli through his agent Brown Welding had a choice of allowing the lease to continue after its initial term or of terminating it and attempting to negotiate an increased rent with A & R or some third party. Brown Welding, and presumably Mr. Hauptli, would have undertaken to increase the rental if the economics *553 of the business had permitted it during the fourth year or thereafter, but in fact as of the time of trial, the 5-year initial term had been allowed to continue on a year-to-year basis for at least 1 year. It was normal for a lease with a fixed term such as the Hauptli lease to carry a lower periodic rent than the Union Carbide arrangement which could be terminated without notice. The management agreement between Mr. Hauptli and Brown Welding is dated June 20, 1983, and provides for compensation to Brown Welding equivalent to 25 percent of rentals payable to Mr. Hauptli under any cylinder lease agreement and any renewal thereof. The sale and security agreement between Mr. Hauptli and Chesterfield appears to be dated February 17, 1984, and provides for the purchase of 1,000 cylinders of specified types and with specified serial numbers for a total price of $ 141,350. The agreement provided for a cash down payment of 10 percent with the balance payable in 120 monthly installments commencing in March 1984. However, the cylinder order specification sheets, pursuant to which the cylinders were ordered by A & R from Brown Welding, are dated October 21, 1983, and reflect shipping dates *554 in November and December 1983, for 1,000 cylinders. The parties have stipulated, and we find, that the 1,000 cylinders which are the subject of this case were purchased by Mr. Hauptli through Brown Welding for lease to A & R pursuant to the October 21, 1983, lease agreement. Mr. Hauptli had no obligation to purchase any cylinders prior to entering into the lease with A & R, and it was his intent to purchase these specific cylinders in order to comply with his obligations as lessor to A & R. The cylinders were actually delivered directly to A & R by the manufacturer in December 1983, and were placed in service during the calendar year 1983. OPINION Petitioners' entitlement to investment credit in this case depends in part upon compliance with the provisions of section 46(e) (3) which applies to noncorporate lessors. Insofar as pertinent to this case, section 46(e) (3) provides: A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if -- * * * (B) The term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, * * *. [2]
*555 * * * For purposes of subparagraph (B), in the case of any recovery property (within the meaning of section 168), the useful life shall be the present class life for such property (as defined in section 168(g) (2)). Again insofar as pertinent, section 168(g) (2) specified that The term "present class life" means the class life (if any) which would be applicable with respect to any property as of January 1, 1981, under subsection (m) of section 167 * * *. If any property * * * does not have a present class life within the meaning of the preceding sentence, the Secretary may prescribe a present class life for such property which reasonably reflects the anticipated useful life of such property to the industry or other group. In this context, subsection 167(m) (1) specifies that, with respect to property which is included in a class for which a class life has been prescribed, a depreciation deduction is allowed based on "the class life prescribed by the Secretary which reasonably reflects the anticipated useful life of that class of property to the industry or other group." These statutes require that we determine the term of the lease and the useful life of the property and *556 match the two in order to ascertain whether or not the term of the lease is less than 50 percent of the useful life. To determine the useful life we go to the class life system in order to ascertain whether or not there is a class life prescribed by the Secretary. Respondent has taken the position that the cylinders fall within Asset Guideline Class 57.0 entitled "Distributive Trades and Services" as prescribed in Rev. proc. 83-35, 1983-1 C.B. 745, 762, which is applicable to property placed in service in 1983. Petitioners argue that there is no Asset Guideline Class applicable to rental of gas cylinders and thus that Rev. Proc. 86-36, 1986-2 C.B. 596 applies. That Rev. Proc. specifies solely for the purpose of determining the maximum term of a lease permissible under section 46(e) (3) that where there is no applicable class life prescribed in Rev. Proc. 83-35, the estimated useful life of the property should be determined in accordance with traditional rules, i.e., the actual useful life of the property in the trade or business. Petitioners thus argue that the useful life is not less than 35 years. On the other hand, Asset Guideline Class *557 57.0 prescribes a useful life of 9 years. Respondent contends that that term of the lease is not 5 years but for an indeterminate period. However, if respondent is correct that the useful life is 9 years based on Asset Guideline Class 57.0, then the term of the lease, which is at least 5 years, violates the less than 50-percent requirement of section 46(e) (3) (B). For the reasons which follow, we agree with respondent that the proper class is Asset Guideline Class 57.0 and for that reason we need not reach respondent's alternative position that the term of the lease is indefinite. The Asset Depreciation Range (ADR) System was adopted by the Treasury Department and published in the Federal Register on June 22, 1971, as section 1.167(a)-11 of the Income Tax Regulations. It was explained in Announcement 71-76, 1971-2 C.B. 503. One of the purposes of the ADR system was to shorten useful lives, thereby liberalizing the depreciation deduction. Announcement 71-76, 1971-2 C.B. at 523. The most significant of the principle additions to the depreciation regulations made by ADR was that machinery and equipment placed in service after December 31, 1970, may *558 be depreciated over useful lives from a range of years selected by the taxpayer between 20 percent below to 20 percent above the guideline lives established by the Treasury Department in 1962. Rev. Proc. 62-21, 1962-2 C.B. 418, established lives for groups of depreciable assets used by businesses in general. The guideline lives were based on general industry experience and reflected the theory that similar assets used by competitive taxpayers within the same industry would tend to have similar useful lives. Announcement 71-76, supra. For nonmanufacturing activities Rev. Proc. 62-21 established "a single guideline class" for each industry. This class was intended to include all depreciable property not covered by another specific guideline class. In those instances where more than one guideline class was specified for a particular industry, each class was intended to cover that portion of the total depreciable property appropriate to the particular class. Class 8 styled "Wholesale and Retail Trades" established a 10-year life. This class included "purchasing, selling, and brokerage activities at both the wholesale and retail level and related *559 assembling, sorting, and grading of goods." Rev. Proc. 62-21, 1962-2 C.B. at 420-422. There was no class covering rental of gas cylinders. Rev. Proc. 71-25, 1971-2 C.B. 553, established asset guideline classes, guideline periods, depreciation ranges, and guidelines class repair allowance percentages related to the ADR system for depreciation of certain classes of assets placed in service after December 31, 1970. The equivalent to guideline class 8 in the 1962 guidelines appeared in this Rev. Proc. as a guideline class 50.0 which covers Wholesale and retail trades: Includes assets used in carrying out the activities of purchasing, assembling, storing, sorting, grading, and selling of goods at both the wholesale and retail level. Also includes assets used in such activities as the operation of restaurants, cafes, coin-operated dispensing machines, and in brokerage of scrap metal. [Rev. Proc. 71-25, 1971-2 C.B. 553, 565.] The asset guideline period established for this class by this Rev. Proc. was 10 years. Rev. Proc. 83-35, 1983-1 C.B. 745, establishes the asset guidelines classes applicable for the year 1983. It is in this *560 Rev. Proc. that we find guideline class 57.0, which "Includes assets used in wholesale and retail trade, and personal and professional services. Includes section 1245 assets used in marketing petroleum and petroleum products." This class 57.0 is the equivalent or successor to class 8 in the 1962 Rev. Proc. and class 50 of the 1971 Rev. Proc. The language changes are of no material significance. Examination of Rev. Proc. 83-35 fails to disclose any guideline class specifically describing the rental of steel cylinders for the storage of compressed gases. However, it does not appear that petitioners' activity in the rental of these steel cylinders is the proper activity for our focus. Respondent's regulations provide that: "In the case of a lessor of property, unless there is an asset guideline class in effect for lessors of such property, the asset guideline class for such property shall be determined as if the property were owned by the lessee." Sec. 1.167(a)-11(e) (3) (iii), Income Tax Regs. Petitioners take note of this regulation but interpret it to refer to the ultimate consumer of the gas who is the sublessee from A & R. We on the other hand interpret the word *561 "lessee" in this context to refer to the entity which is actually using the cylinders in its gas distribution business which is A & R. This result is entirely consistent with the fact that Mr. Hauptli went into the transaction and acquired the 1,000 cylinders which are the subject of this case with the purpose and intent of leasing those cylinders to A & R. The parties have stipulated that A & R is engaged in the "welding supply business" which business has three major categories. We find no asset guideline class which specifically applies to the welding supply business or to any of these principal categories of the business of A & R other than class 57.0 which applies in general to wholesale and retail trades. We conclude that the proper guideline class is 57.0 and thus the useful life of these cylinders is deemed to be 9 years. Petitioners' argue that the term of the cylinder lease is 5 years and there is no basis for finding a shorter term. Hence the term of the lease exceeds the limitation of section 46(e) (3) (B) -- 5 years is more than 50 percent of 9 years. We have fully considered petitioners' other arguments including their alternative positions that guideline class *562 49.21 applying to "Gas Utility Distribution Facilities" or asset guideline class 34.0 entitled "Manufacture of Fabricated Metal Products" should apply. We find no merit to those arguments. Petitioners have also reargued on brief that Exhibit 8 which is a copy of the examination report issued to petitioners should be admissible in order to demonstrate that respondent's reliance on asset guideline class 57.0 is a new issue and the burden of proof would be upon respondent. We decline to reverse our ruling excluding Exhibit 8. The revenue agent's report has no necessary relationship to or bearing upon the statutory notice issued to a taxpayer. What we are concerned with is the provisions of the statutory notice issued in this case which we find to be amply broad to raise the issue of the useful life of these cylinders. But we have not decided this case on the burden of proof. We have based our conclusions on the entire record in this case which fully supports our findings of fact. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent concedes that petitioners met the 15-percent test which is also a part of section 46(e) (3) (B).↩